## BRADY vs. McKEE & ROBERTS.

Certain carriages and harness were bought in Columbus of McKee & Roberts, whether by Livingston or Brady, there is some conflict in the testimony. Livingston gave his note in payment, with a stipulation upon its face thatthe note of Dr. Wardlaw might be substituted for his, Livingston's. The decided weight of proof is, that Livingston made the trade, and that the vendors looked to him for payment. McKee & Roberts sue Brady in assumpsit for the purchase money: *Held*—1. That the Court erred in refusing to charge as requested, that the fact that the vendors took the note of Livingston at the time of the sale for the purchase-money, was *prima facie* evidence that the credit was given to him; and in adding a qualification that had nothing to do with the legal principle contained in the request, namely: provided the note was absolute upon its face, and nothing further to be done by the parties thereto; the only condition being the stipulation that Livingston might substitute Dr. Wardlaw's note for his. 2. In charging that the payment by a promissory note on an insolvent person was no payment at all, the proof showing that the payment was not by Brady, the defendant, in Livingston's note, but by Livingston in his own note: *Held*, That the remedy, if there was any against Brady, was to charge him upon the fraud in the transaction, and not upon the contract of sale.

Assumpsit, from Sumter County.    Tried before Judge ALLEN, at October Term, 1859.

The defendants in error, McKee & Roberts, brought their action of assumpsit against the plaintiff in error to recover the value of a carriage and buggy and harness which they had before sold and delivered to the latter, under the circum-

stances and upon the agreement indicated in the evidence introduced by the plaintiff in the Court below, and which is as follows:

Abner S. Mariner testified, in substance, that he was in the employment of plaintiffs, who were engaged in the carriage business in Columbus, Ga.; he recollects that W. W. Livingston, of Chattahoochee county, and Wright Brady, of Sumter county, called at plaintiff's place of business on or about the 14th day of November, 1856; their business was to buy two fine carriages—one Berlin coach, or rockaway, and one no-top buggy, and harness for the same; Brady bought the said carriages and harness; Livingston had no agency in the trade, except to obtain the consent of Mr. Roberts to take a note, or certain notes, from Brady; Brady made the trade, and was to furnish Livingston with certain notes from the sale of negroes to be handed to Roberts; Livingston introduced Brady to Roberts, and represented him as being very wealthy, and responsible; the credit was given to Brady in notes, as before stated; Roberts was acquainted with Livingston's circumstances, and knew him not to be solvent; Roberts requested the notes of Brady, and Brady told him they should be forthcoming within ten days through Livingston; Brady took the carriages away.

James Vernoy testified, that he saw Wright Brady in Columbus, Ga., on the 14th day of November, 1856; he told witness he had bought a carriage and buggy, with harness, from McKee & Roberts for the sum of $900 00; Brady came to witness' stable at the time stated and told witness to send a pair of horses and driver to McKee & Roberts, and put them to a new coach and to hitch on a new buggy, which was done; he hired the horses and driver from witness, and paid him for them, and drove them off; the carriage, buggy and harness were worth $900 00; Brady got them from McKee & Roberts; he then asked witness if he, Brady, did not pay too much for them? witness replied, "he did not;" was present when a conversation was going on between Roberts, one of the firm of McKee & Roberts, and Wright Brady, in March, 1857; Dr. David Young and a Mr. Wilcher were present; the conversation was about a coach and harness, and a no-top buggy and harness, and Wingfield Livingston; it was at McKee & Roberts' office, in Columbus, Georgia; Brady asked Roberts if the arrangement as made by Livingston would

satisfy him? Roberts said it would; this was admitted by both at that time, and this is all that was admitted.

Plaintiffs here rested their case.

The defendant then introduced the following evidence:

Jordan Wilcher testified, that he was in Columbus about the first of April, 1857, and present at a conversation that took place between plaintiff and defendants about a carriage and buggy the defendant had got from plaintiff; Dr. Young was also present; Mr. Roberts said that Livingston had made the bargain and arrangement with him for the goods; that Livingston was to give plaintiff his note therefor; that Livingston had said that he had expected to sell some negroes to a man named Wardlaw, and if he did, he would pay him in Wardlaw's notes; Roberts said that Livingston had given plaintiffs his note for the purchase money in accordance with the agreement made by Roberts and Livingston; no one was to endorse Livingston's note.

Roberts further stated to the defendant that before the defendant selected the carriage and buggy, that defendant asked him if the arrangement had been made for the carriage and buggy, and that he said to him that satisfactory arrangements had been made for the purchase of the same. Roberts also stated, that he did not inform, or had not informed, the defendant that he had charged the carriage and buggy to him at the time; Roberts stated he had charged the articles to defendant with the knowledge of defendant; that the defendant was not present at the time the bargain was made by Livingston; witness says he went with defendant, and at his request, to see Roberts, and told "witness" what Roberts said about the matter.

Dr. Young testified, that he was present at the same conversation, and stated what he heard Roberts say, which was the same, in substance, as the foregoing, except that he gave a more detailed statement of what was said by Roberts. He also stated he was requested by Brady to witness the conversation with Roberts.

Thomas McBride testified, that Livingston bought a buggy from plaintiff in 1854, and gave his own note for it; in 1856 Livingston also bought a fine rockaway and harness of plaintiff on a credit; he paid for the buggy; does not know whether he paid for the rockaway or not; Livingston lives some ten miles from Columbus, and from plaintiff's long

acquaintance with him, they must know something of his capacity to pay.

John McGough and George McGough testified, that they had considered Livingston good at one time, but in 1856 and '57 they considered him doubtful; were informed that the property he had belonged to his wife; witnesses are dry goods merchants; sold Livingston what goods he wanted in their line on credit, and have continued to do so up to January 1st, 1858; considered him doubtful, but they and others sold him goods on credit; they knew nothing to show that he had a good credit.

David L. Booker testified, that he gave Livingston credit in the early part of 1856 on his own account, but in the latter part of the year found the property he had belonged to his wife, and after that charged good sold to his wife's trustee; witness' information was received from Livingston himself and his wife's trustee; does not know the extent of his credit in Columbus; witness again commenced crediting him on his word of honor and individually.

J. B. Jaques testified that he had known A. S. Mariner about seven years; knew him in the employ of plaintiffs in 1855 and '56, as clerk, salesman, collector, etc.; that he was acquainted with the general character which he bore in Columbus in 1855 and '56 for truth and veracity, and would not, from such knowledge, believe him on his oath in a Court of justice; that said Mariner had absconded and run away from Columbus in 1856, between Christmas day and New Year's day.

Z. Rodger and Sarah Frederick testified to the same effect.

Jeremiah Terry testified, that Mariner's character in Columbus in 1856 and '57 for truth and veracity was very bad; was a very unreliable man; might believe him under some circumstances, but would not attach as much importance to his oath as to that of a man of unquestionable veracity.

H. K. McKay testified, that in the summer of 1856 Livingston was indebted to Brady about $1,000 00; that Brady more than once insisted on being paid; that Livingston made several propositions of payment; among others, offered to sell him a negro man; that he finally proposed to Brady that he had a good credit in Columbus, Ga., and would buy him a carriage, as he had heard his wife say she wanted one; a few days after the carriage transaction, Abe, the negro

man, ran away and came to Sumter, and that soon after, Livingston and his father got into a litigation about him and other negroes; witness knew Brady had no interest in Abe; he had an interest once, but had sold some time ago.

John R. Worrill testified, that he saw Roberts in Columbus in 1857; made his acquaintance then, and spoke to him of this case; Roberts said that Livingston had come to him alone one morning; told him he was owing Brady; that Brady wanted a carriage and buggy; that he wanted to pay Brady what he owed him; that he had a negro man who he contracted to be sold to Dr. Wardlaw; that he wished to get the articles with the understanding he should pay for them in Wardlaw's note; to that plaintiffs agreed, if Livingston would endorse Wardlaw's note; that afterwards, Livingston brought to the shop Brady and his wife, who, after inquiring if satisfactory arrangements had been made, selected the articles and took them off.

Wesley McGrady testified, that he knew Livingston in 1855 and '56; he then had a good credit; had seen him buy goods in Columbus on credit.

Defendant then put in evidence the note, of which the following is a copy, drawn from plaintiffs under notice:

"$900 00.
"COLUMBUS, GA., 14th Nov., 1856.

"On demand, I promise to pay McKee & Roberts, or bearer, Nine Hundred Dollars, with interest. Witness my hand and seal, to be exchanged for note Dr. Wardlaw endorsed.
(Signed) "W. W. LIVINGSTON."

In rebuttal, plaintiffs then proved by Seaborn Jones, John A. Jones, A. S. Rutherford, F. M. Brooks, R. L. Mott, I. J. Moses and some sixteen other witnesses, that they were well acquainted with A. S. Mariner, and that they would readily believe him on his oath in a Court of justice; by a number of these, that they would believe him as readily as they would any one. They also proved by several witnesses that Mariner did not run away, but told them when and where he was going, and that he afterwards returned and fulfilled a contract for work with the plaintiffs, staying some time with them before he returned home.

Hines Holt testified, that in March, 1857, he thinks it was,

Brady, Roberts, and one or two others were in his office in conversation about the sale of a carriage and buggy; Roberts asserted that they had been sold and charged to Brady, and that Brady had received them and carried them away; Brady asserted that they had been sold to Livingston, who was alone bound to pay for them; there was a long discussion or wrangle between them, each standing to his own position; witness cannot detail all that each said.

H. T. Hall testified, that he had had dealings and accounts for years with plaintiffs, and always found them correct in their dealings.

(Verney and Holt had before testified to the same effect.)

James McBride testified, that he was trustee for Livingston's wife, witness' sister, from 1854 to 1857; all her property was then in him as trustee; knew of no property in November, 1856, which would have been subject to his debts; he was indebted at that time, but cannot state the amount; he bought a buggy of plaintiffs in 1854, but bought it for his family, and it was considered as part of the trust property; witness gave the money, as trustee, to him to pay plaintiffs therefor, which he did, taking their receipts in witness' name as such trustee.

The jury found for the plaintiffs.

Whereupon, the defendant moved for a new trial, on the following grounds:

1st. That the jury found contray to law.

2d. That the jury found contrary to evidence.

3d. That the jury found contrary to the weight of the evidence.

4th. That the Court erred in refusing to charge the jury as requested by defendant in the words requested, to-wit: "That upon the sale of property, the taking by the vendor of a promissory note of a third person, made at the time payable to the vendor, is *prima facie* at least, evidence that the credit was given to that person." And instead thereof, in charging the words, with the addition, "provided that the note is absolute upon its face, and nothing further to be done by the parties thereto."

5th. Because the Court erred in charging the jury in this case that payment by a promissory note on an insolvent person is no payment at all.

6th. Because the Court erred in charging the jury, that if

the jury believe, from the evidence, that Livingston and Brady are brothers-in-law; that Livingston was indebted to Brady $900 00 or a $1,000 00, and that Livingston was insolvent, or in doubtful pecuniary circumstances, and that Livingston and Brady went to Columbus in view of Livingston's buying the carriages and harness from plaintiffs for Brady, that Livingston went to plaintiffs and made a false statement, and thereby obtained the property; that the property went into Brady's use and possession, the fraud of Livingston vitiates the sale, and Brady being the beneficiary of the fraud, he is liable for the value of said goods so sold.

7th. That if the jury believe, from the evidence, that Brady and Livingston are brothers-in-law; that Livingston was insolvent; that Brady knew it, and that Livingston and Brady agreed that if Livingston would pay him in carriages, that in pursuance of said agreement, Brady and Livingston were in Columbus together when the goods were bought; that Livingston went to plaintiff's carriage repository and told plaintiff, Roberts, that he owed Brady, and that he and Brady had three negroes jointly in Chattahoochee county, in which Brady (?) was interested, and were about to sell them to Dr. Wardlaw, and agreed to pay them in Wardlaw's notes; that Livingston then went and brought Brady to plaintiffs; that Brady inquired if the arrangement was made, this is evidence from which they may infer Brady's assent to what Livingston represented to plaintiff, and at all events, that if the jury believe the above to have been proven, Brady is liable to pay for the goods.

8th. Because there was error in this, that after the jury had agreed upon a verdict, they returned a verdict as follows: "We, the jury, find for the plaintiff nine hundred dollars, and the plaintiff deliver to defendant the note on Livingston." Which verdict was read by plaintiff's counsel in open Court, and the Court compelled the jury to retire and find for defendant, or plaintiff, with correction.

The Court overruled the motion on all the grounds, and defendant excepted.

McCay & Hawkins, for plaintiff in error.

J. J. Scarborough, for defendant.

Brady *vs.* McKee & Roberts.

*By the Court.*—LUMPKIN, J., delivering the opinion.

If this case rested upon the evidence alone, we should not disturb the verdict and judgment. But there are, in our judgment, errors in law, in this case, which ought to be corrected before a just result can be arrived at.

We think the Court should have given to the jury the instructions asked for in the first request, without qualification. The request was, that McKee and Roberts having taken the note of Livingston in payment of the carriages and harness, it was *prima facie* evidence that he gave credit to them and looked to them for payment.

The Court, in response, said, " yes, provided the note is absolute upon its face, and there is nothing further to be done by the parties." Now, there is, it is true, a stipulation upon the face of the Livingston note, but what is it ? Why, that Livingston should have the privilege of substituting Dr. Wardlaw's note in the place of his. What has Brady to do with this ? and how does it interfere with the presumption of law, suggested in the request ?

The first charge given, as well as the first request refused, except with a qualification, is erroneous, namely, that " payment by a promissory note on an insolvent person, is no payment at all." Mr. Brady did not purchase and pay for the property with Livingston's note ; on the contrary, Livingston paid for the articles bought with his own note, and whether it be good or bad, what has Brady to do with that ?

The truth is, Brady, if liable at all, is liable upon the ground of fraud, and not upon the contract. To treat Livingston's contract as Brady's contract, is a total perversion of the proof, as well as a misconception of the only remedy against him.

Under the present form of proceeding, we think it unnecessary to enter upon an examination of the testimony.